UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| THOMAS P. LOWE, | ) | Civil Action No.: 4:15-cv-0669-PMD-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security; | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This is an action brought pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. Section 405(g), to obtain judicial review of a "final decision" of the Commissioner of Social Security, denying Plaintiff's claim for social security disability income benefits (DIB). The only issues before the Court are whether the findings of fact are supported by substantial evidence and whether proper legal standards have been applied.

## I. RELEVANT BACKGROUND

### A.    Procedural History

Plaintiff filed an application for DIB on February 4, 2011, alleging inability to work since July 1, 2005. His claims were denied initially and upon reconsideration. Thereafter, Plaintiff filed a request for a hearing. A hearing was held on April 9, 2013, at which time the Plaintiff and a vocational expert (VE) testified. The Administrative Law Judge (ALJ) issued an unfavorable decision on May 24, 2013, finding that Plaintiff was not disabled within the meaning of the Act. (Tr.33-63). Plaintiff filed a request for review of the ALJ's decision, which the Appeals Council denied on October 27, 2014, making the ALJ's decision the Commissioner's final decision. (Tr. 2-7).

Plaintiff filed an action in this court on February 16, 2015.

## B.     Plaintiff's Background

Plaintiff was born on April 8, 1959. (Tr. 61). Plaintiff completed his education through twelfth grade and has past relevant work experience as an electrician and a supervisor of electricians while on active duty in the U.S. Army. (Tr. 61, 128). Plaintiff served in the Army from October 11, 1982, to March 29, 1983, and from September 10, 1990, to June 30, 2005, when his was medically discharged. (Tr. 132, 734). Plaintiff alleges disability due to degenerative disc disease of the neck and back, degenerative joint disease of the ankles, bilateral carpal tunnel syndrome, headaches, claustrophobia, PTSD, depression, anxiety, diabetes mellitus, sleep apnea, vision problems, stomach problems, knee pain, and hypertension. (Tr. 205).

## C.     The ALJ's Decision

In the decision of May 24, 2013, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 3, 2010.

2.    The claimant has not engaged in substantial gainful activity during the period from his alleged onset date of July 1, 2005, through his date last insured of December 31, 2010 (20 CFR 404.1571 et seq.).

3.    Through the date last insured, the claimant has the following severe impairments: degenerative disc disease of the neck, degenerative disc disease of the lumbar spine, carpal tunnel syndrome bilaterally, headaches, degenerative joint disease of the ankles, claustrophobia, PTSD, depression and anxiety (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).

5.    After careful consideration of the entire record, I find that, through the date last insured,  the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant could lift 20 pounds occasionally and 10 pounds frequently; he could sit, stand, and walk up to six hours each out of an eight-hour workday; he could push/pull with the upper extremities on an [sic] frequent basis; he could never climb ropes and ladders; he could occasionally climb, balance, stoop, kneel, crouch and crawl; he could handle, finger, and feel on a frequent basis; the claimant should avoid concentrated exposure to hazards and vibrations; the claimant is limited to simple one- or two-step tasks in a low stress work environment defined as non-production work requiring no fast-paced work where the worker would need to produce a product in a high speed manner and no public contact.

6.    Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on April 8, 1959, and was 46 years old as of the alleged onset date, which is defined as a younger individual age 18-49.  The claimant was 51 years old as of the date last insured, which is defined as closely approaching advanced age (20 CFR 404.1563).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could perform (20 CFR 404.1569, 404.1569(a)).

11.    The claimant was not under a disability, as defined in the Social Security Act, at any time from July 1, 2005, the alleged onset date, through the date last insured (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 33-63).

-3-

## II. DISCUSSION

The Plaintiff argues that the ALJ erred in his decision, and that reversal and remand are appropriate in this case. Specifically, Plaintiff raises the following issues in his brief, quoted verbatim:

I.      The ALJ must evaluate the claimant's VA rating decision. Can a decision that summarily dismisses a VA rating decision stand?

II.     To reject the doctors' findings of limitations that disable, the ALJ relied on statements Lowe had improved, or was doing well where the doctor did not say well as compared to what. Where an ALJ bases a rejection of the treating physician rule on such findings, in contradiction to both reason and a controlling 4ᵗʰ Circuit precedent, must the case be remanded for a proper evaluation?

III.    To reject the doctors' findings of limitations that disable, the ALJ relied on select references to the computer-generated wording in the doctor's office notes, which words were repeated from visit to visit, that were directly contradicted by the actual findings of the doctors. Where an ALJ puts into a doctor's mouth words actually created by mindless computer action, has the ALJ given a sufficient reason to reject the treating physician rule?

IV.     Opinion evidence. The opinion evidence of Lowe's treating providers, Dr. Jachna and Mr. Rosenberger, contain work-preclusive limitations which the ALJ improperly rejected. Where the ALJ improperly ignores the opinion evidence, can his decision be supported by substantial evidence?

(Plaintiff's brief).

The Commissioner argues that the ALJ's decision is supported by substantial evidence.

## A.      LEGAL FRAMEWORK

### 1.      The Commissioner's Determination–of–Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as: the inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months. 42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. See, e.g., Heckler v. Campbell, 461 U.S. 458, 460, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity ("SGA"); (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents him from doing SGA. See 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is

---

[1]The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; Sullivan v. Zebley, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990); see Bowen v. Yuckert, 482 U.S. 137, 146, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2]In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. See 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d) (5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir.2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. Hall v. Harris, 658 F.2d 260, 264–65 (4th Cir.1981); see generally Bowen v. Yuckert, 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) (regarding burdens of proof).

## 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [ ] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. See id.; Richardson v. Perales, 402 U.S. 389, 390, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); Walls, 296 F.3d at 290 (citing Hays v. Sullivan, 907 F.2d 1453, 1456

(4th Cir.1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." Vitek v. Finch, 438 F.2d 1157, 1157–58 (4th Cir.1971); see Pyles v. Bowen, 849 F.2d 846, 848 (4th Cir.1988) (citing Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 390, 401; Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir.2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. See Vitek, 438 F.2d at 1157–58; see also Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir.1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir.1972).

B.    ANALYSIS

1.    Department of Veteran's Affairs Rating Decisions

Plaintiff was assigned a combined disability rating of 80% from the Department of Veterans' Affairs (the VA), effective August 1, 2006. (Tr. 188). The VA found service related disabilities of degenerative joint disease lumbar spine status post discectomy, bilateral upper radiculopathy, claimed as carpel tunnel and cubital tunnel syndrome, degenerative disc disease cervical spine status post C3-C6 laminectomy, migraine vascular headaches, and degenerative joint disease in the right and left ankles. (Tr. 186-201). The combined disability rating was later reduced to 70%, but Plaintiff was paid at a 100% rating due to a finding of unemployability effective March 23, 2006. (Tr. 734-37). The ALJ gave this rating some weight, stating,

> There are several opinions and ratings determination from the VA, which support the claimant's allegations somewhat (7F, 13F, 1D, 3D, l0E, and 17F). In this instance, I have considered the VA ratings and opinions, and in general, I give them some weight. For example, based in part on these documents, I have included limitations in the residual functional capacity, when the State agency physicians did not propose any. However, in general, the ratings and statements do not articulate limitations in functional terms that could be used in the residual functional capacity. Furthermore, the guidelines used by the VA are not the same as those used by the Agency in determining disability.

(Tr. 57).

The ALJ is required to consider all record evidence relevant to a disability determination, including decisions by other agencies, but those decisions are not binding on the ALJ. SSR No. 06–03p, 20 C.F.R. §§ 404.1504, 404.1512(b)(5).  In Bird v. Commissioner of Social Security Administration, 699 F.3d 337 (4th Cir. 2012), the Fourth Circuit addressed the weight to be given to a disability determination made by the VA.  The court noted that "both the VA and Social Security programs serve the same governmental purpose of providing benefits to persons unable to work because of a serious disability. 'Both programs evaluate a claimant's ability to perform full-time work in the national economy on a sustained and continuing basis; both focus on analyzing a claimant's functional limitations; and both require claimants to present extensive medical documentation in support of their claims.'" Id. at 343 (citing McCartey v. Massanari, 298 F.3d 1072, 1076 (9th Cir.2002)) (internal citations omitted).  "Because the purpose and evaluation methodology of both programs are closely related, a disability rating by one of the two agencies is highly relevant to the disability determination of the other agency."  Id.  The court held that "in making a disability determination, the SSA must give substantial weight to a VA disability rating."  Id.  However, it further held that "because the SSA employs its own standards for evaluating a claimant's alleged disability, and because the effective date of coverage for a claimant's disability under the two

programs likely will vary, an ALJ may give less weight to a VA disability rating when the record before the ALJ clearly demonstrates that such a deviation is appropriate." Id.

As stated above, the ALJ gave the VA's rating decision some weight. Thus, because the ALJ did not give the VA rating decision significant weight as required in Bird, the question becomes whether the record before the ALJ clearly demonstrated that such a deviation was appropriate. Bird, 699 F.3d at 343; see also Jacobs v. Colvin, No. 2:12–cv–508, 2013 WL 5741538 at *6, (E.D.Va. Oct. 22, 2013) (noting that Bird requires the ALJ to "explicitly detail" the reasons for not giving a VA rating decision substantial weight). Here, the ALJ first notes that, based in part on the VA ratings decisions, he included some functional limitations in the RFC. (Tr. 57). For example, with respect to Plaintiff's degenerative disc disease in his lumbar spine, the VA ratings decision noted that Plaintiff could still walk up to 2.5 miles without any flare ups, but it effected his activities of daily living by slowing down the speed with which he could perform activities. (Tr. 193). In the RFC, the ALJ found that Plaintiff could walk, stand or sit for a total of six hours out of an eight hour day and was limited to non-production work requiring no fast-paced work. (Tr. 39). With respect to Plaintiff's carpal tunnel syndrome, cubital syndrome, and degenerative disc disease of the cervical spine, the VA noted decreased grip strength, numbness, and decreased touch sensation in his fingers and thumbs. (Tr. 194). The VA also found that these issues decreased from moderate on October 24, 2005 (Tr. 194, 196), to mild on February 14, 2007. (Tr. 736, 737). The ALJ found that Plaintiff could only frequently, rather than constantly, handle, finger and feel. (Tr. 39).

The ALJ then gives two reasons for not giving substantial weight to the findings in the VA ratings decisions. The second reason, that "the guidelines used by the VA are not the same as those used by the Agency in determining disability" (Tr. 57), is insufficient. This fact is acknowledged by

the Fourth Circuit in <u>Bird</u> and is so in every case.  Deviation is not appropriate simply because the guidelines are different.  Otherwise, the requirement that the VA rating decision be given substantial weight would be meaningless.  Next, the ALJ states that "the ratings and statements [from the VA] do not articulate limitations in functional terms that could be used in the residual functional capacity."  (Tr. 57).  Indeed, other than the functional limitations for which the ALJ accounts in the RFC as discussed above, the VA ratings decisions do not contain extensive discussion of such limitations.  Therefore, the ALJ's discussion of the VA ratings decisions could only be as detailed as the VA ratings decisions themselves with respect to issue before the ALJ, that is, Plaintiff's residual functional capacity.  In the absence of more detailed discussion by the VA supporting its disability findings, the ALJ relied on and discussed thoroughly in his 31-page hearing decision the other medical evidence in the record.  Therefore, substantial evidence supports the ALJ's decision to accord the VA's ratings decision only some weight.

> 2.    **"Doing Well"**

Plaintiff next argues that the ALJ's reliance on Plaintiff's mental health providers' use of the phrase "doing well" is insufficient to support his conclusion that Plaintiff was able to perform substantial gainful activity.

In December 2005, Plaintiff initiated mental health care at the VA. He reported feeling sad, restless sleep, concentration difficulty, agitation, and financial stress since his retirement from the military in July 2005. On examination, Plaintiff appeared well groomed, was alert and oriented to time, place, and person, had a depressed and anxious mood, and exhibited fair concentration and memory, (Tr. 446). He also scored 25 out of 30 on a Mini-Mental Status Examination. (Tr. 441-42). Plaintiff was assessed with an adjustment disorder with depressed and anxious mood and a global

-10-

assessment functioning (GAF) score of 45, (Tr. 447). Medication management and therapy were recommended. (Tr. 443).

In January 2006, Plaintiff began cognitive-behavioral therapy with Laurel Shaler, LCSW. Plaintiff and Ms. Shaler discussed finding outlets for his time since his retirement. Plaintiff reported applying for a part-time job and had been asked to oversee construction/maintenance at the golf course he lived on. Plaintiff's mental status examination was unremarkable with normal speech, mood/affect, memory, and concentration.  (Tr. 507-08).

In February 2006, Abdalla Bamashmus, M.D., prescribed Effexor. (Tr. 498). Plaintiff also appeared for cognitive-behavioral therapy with Laurel Shaler, LCSW. (Tr. 494). Plaintiff reported fatigue, low energy, and intermittent sadness. However, he had recently started working with his son on a Pepperidge Farm franchise, which he helped his son purchase and was going to begin running/walking again, which he enjoyed. (Tr. 494-95). Ms. Shaler found that Plaintiff was neatly dressed, spoke normally, made good eye contact, displayed mildly depressed mood/affect, and had good memory and concentration.  (Tr. 494-95). Later that month, Plaintiff underwent a sleep study, which showed mild to moderate sleep apnea and a CPAP device was recommended. (Tr. 496-97).

In March 2006, Plaintiff reported a "50% improvement" since initiating mental health treatment. (Tr. 490). He appeared "a little anxious," however, had not taken his medication in over a week (due to a delay in receiving them).  (Tr. 490). He reported fatigue but was about to begin use of a CPAP device.  (Tr. 490).  He related that he had planned a fishing trip with friends, exercised four times a week by walking around a golf course, and worked with his son a couple times a week. (Tr. 490). Ms. Shaler concluded that Plaintiff had made "great improvement" since he began mental health treatment three months prior and assessed him with a GAF score of 58. (Tr. 490-91).

In May 2006, Plaintiff reported "doing real[ly] good." (Tr. 487). His sleep was improved with use of a CPAP machine. Plaintiff had been going fishing, exercising, and spending time with his friends and family. He was also helping his son with a Pepperidge Farm business. Therefore, he explained he did not want to be deemed totally and permanently disabled by the VA and requested a letter stating that working helped his anxiety. Ms. Shaler found that Plaintiff appeared well groomed and anxious but happy. He spoke normally and displayed intact thought processes and content. His memory was intact, and his concentration was "good." Ms. Shaler assessed a GAF score of 60.  (Tr. 487).

In June 2006, Plaintiff again told Ms. Shaler "I'm doing real[ly] good" reporting no depression, anxiety, or stress, and sleeping well. (Tr. 475-76). He related being "happier" when "staying busy," which he had been doing. (Tr. 476). For example, he went fishing every Tuesday, exercised regularly, and helped his son with his business. Plaintiff was alert and oriented; he maintained good eye contact; his mood was good and affect was normal; he spoke normally; his thought processes and content were intact; his fund of knowledge was adequate; and his memory and concentration were intact. (Tr. 475-76). Ms. Shaler assessed a GAF score of 65. (Tr. 476).

In September 2006, Plaintiff appeared for therapy. (Tr. 471). Plaintiff reported stress after receiving a letter that his VA disability rating may be decreased, otherwise, had been "doing well" with his mental health. (Tr. 472). Plaintiff appeared a little unkempt with anxious and depressed mood, but his speech, affect, thought processes, and ability to concentrate were unremarkable. Plaintiff's PTSD screen was negative. (Tr. 473). Ms. Shaler noted that Plaintiff was responding well to therapy and assessed a GAF score of 60. (Tr. 472-73). In February 2007, Plaintiff returned for a psychopharmacology appointment after a year gap in treatment as well as not attending therapy "in

-12-

a long time." (Tr. 550). Plaintiff reported increased depression. Katherine Archer, M.D., adjusted his prescription for Effexor and told Plaintiff to re-initiate therapy. (Tr. 551).

In March 2007, Plaintiff had a therapy session with Rebecca Roesch, LMSSW. (Tr. 539-40). He reported depression and sleep problems associated with pain. (Tr. 539). He was the primary caregiver for his disabled wife, who had recently undergone several spine surgeries. Plaintiff spoke normally while making good eye contact; his affect was normal and mood was reported as slightly depressed and anxious; his thought content and processes were normal; and his concentration and memory were intact. (Tr. 538). Ms. Roesch assessed a GAF score of 64. (Tr. 540).

In August 2007, Plaintiff returned for a mental health follow up. (Tr. 533-34). His PTSD screen was negative. (Tr. 533-34). He reported "doing pretty good." (Tr. 534). Dr. Archer documented that Plaintiff appeared calm and cooperative and assessed depression, moderate, stabilizing and continued Effexor.  (Tr. 534).

In February 2008, Plaintiff continued to report that Effexor was working "good" for his depression. (Tr. 582).  In February 2009, John Jachna, M.D., assessed that Plaintiff continued to have good benefit from Effexor. (Tr. 625). Plaintiff's mental status was unremarkable, and Dr. Jachna continued his treatment regimen. (Tr. 626-27).

In August 2009, Dr. Jachna documented "continued excellent response of mood and irritability [due] to Effexor, with no side effects." (Tr. 607). On examination, Plaintiff was pleasant and cooperative; he displayed a full-range of affect and euthymic mood; and his cognitive functioning was intact.  (Tr. 607).

In February 2010, Plaintiff was "doing well" on Effexor and, accordingly, his medication regimen was unchanged. (Tr. 399).

In April 2010, Plaintiff reported that his mental health treatment regimen was helping; his mental health condition was stable; and he was "doing well" on Effexor. (Tr. 382, 390). On examination, Plaintiff was well groomed, pleasant, and cooperative. (Tr. 391). His mood was euthymic and affect was full-range.. Plaintiff denied any delusions, hallucinations, or suicidal/homicidal ideation.. Plaintiff's cognitive functioning was intact.. Dr. Jachna assessed that Plaintiff was "doing well," and refilled his psychotropic medication. (Tr. 393).

In October 2010, Plaintiff returned for a psychiatric follow-up appointment. (Tr. 360). Plaintiff reported "doing well" on medication. More specifically, despite the stress of his mother's recent death and sale of her house, which he was handling, his mood had remained stable. (Tr. 360-61). Plaintiff's mental status examination was normal. (Tr. 361). Plaintiff was pleasant and cooperative; his mood was euthymic and affect was full-range; he spoke normally; and his cognitive functioning was intact. Dr. Jachna assessed that Plaintiff was coping despite increased environmental stressors and renewed his prescription for Effexor. (Tr. 363).

Plaintiff takes issue with the fact that the ALJ mentions multiple times that he was "doing well" with respect to his depression and anxiety. Plaintiff points to numerous cases in which the court held that use of the phrase "doing well" and other indications of stability do not compel a conclusion that a claimant is able to engage in substantial, gainful activity.  (Pl. Brief 25-26).  The cases cited by Plaintiff in his brief provide that the phrase "doing well" is relative and should be viewed in context,  Brascher v. Astrue, 3:10-cv-256, 2011 WL 1637029, *7 (E.D.Va. Mar. 11, 2011), that an ALJ cannot "focus on the simple phrase 'doing well' while disregarding the remainder of the physician's report," id., and that the phrase does not necessarily compel a conclusion that a claimant can engage in substantial gainful activity, Barriault v. Astrue, No. 07–CV–176–SM, 2008

WL 924526, at *7 (D.N.H. Apr. 2, 2008); <u>Fleshman v. Sullivan</u>, 933 F.2d 674, 676 (8th Cir.1991);

<u>Hutsell v. Massanari</u>, 259 F.3d 707, 712 (8th Cir.2001).    Plaintiff also argues that "isolated

references in the physician's notes to 'feeling well' and normal activity' are not a substantial basis

for rejecting as incredible the claimant's subjective complaints of exertional limitation." <u>Kellough</u>

<u>v. Heckler</u>, 785 F.2d 1147, 1153 (4th Cir. 1986).    The ALJ's consideration of Plaintiff's medical

records in the present case is not inconsistent with these cases.    He does not read the use of the

phrase "doing well" out of context nor is his decision with respect to Plaintiff's mental impairments

based solely on use of this phrase.

 The ALJ includes a thorough discussion of Plaintiff's mental health records.    (Tr. 49-52).

It should be noted that many times when the phrase "doing well" or something similar appears in

Plaintiff's mental health records, it is Plaintiff's own assessment of how he is feeling.    From 2006

through his date last insured of December 31, 2010, Plaintiff consistently reported to his mental

health providers that he was "doing really good" or "doing well." (Tr. 487, 475-76, 472, 534, 582,

399, 382-90, 360).    Although he reported some various stressors at times, overall, his mental health

records reveal that his depression responded well to therapy and medication.    In addition to

recognizing Plaintiff's own comments that he was doing well, the ALJ also discusses Plaintiff's

reports that working helped to keep his mind off of depression, he enjoyed walking and running and

agreed to do more, he was happier when he stayed busy, he had been exercising regularly and going

fishing every Tuesday, and  watching TV and spending time in the hot tub helped him relax.    (Tr.

50).    The ALJ also notes that, in June of 2006, Plaintiff felt he was doing well enough to discontinue

treatment.    (Tr. 50).    However, he resumed therapy and increased his dosage of Effexor in February

of 2007 after having difficulty without the therapy.    (Tr. 50-51).    From that point forward, as

discussed by the ALJ, Plaintiff's medical records reveal improvement of his mood with treatment and medication. (Tr. 51). Plaintiff requested to reduce his dosage of Effexor in August of 2009, but upon counseling, agreed to maintain his current dosage to avoid a relapse of symptoms. (Tr. 51). The ALJ notes that, in October of 2010, Plaintiff reported increased stress relating to his mother's death and dealing with her estate. (Tr. 52). However, despite his increased stress, he reported that his mood remained "ok" and remarked "Thank God for Effexor." (Tr. 52). For these reasons, substantial evidence supports the ALJ's findings with respect to Plaintiff's mental impairments and Plaintiff's argument is without merit.

### 3. Computer-Generated Wording

Plaintiff makes a similar argument with respect to the ALJ's reliance on what he calls "computer-generated wording in the doctor's office notes." Plaintiff states that the ALJ noted nine times in his decision that Plaintiff "denied weight change, malaise, joint pain, swelling, stiffness, weakness, myalgias, headache, poor vision, poor hearing, tinnitus, breathing problems, syncope, paresthesias, cardiac problems, and gastrointestinal problems, among others. The claimant denied dysuria, polyuria, polydipsia, appetite change, and heat/cold intolerance. He denied numbness, dizziness, depression, anxiety, and memory changes." (Tr. 44, 45, 46, 47, 48). Plaintiff argues that these statements appear in the "Review of Symptoms" section in all of Plaintiff's medical records from the VA and "are clearly unchanged, computer-generated findings that are carried forward throughout the medical records without review or actual adoption by the physician." (Pl. Brief 27-28). Plaintiff points to several instances where the findings in the "Review of Symptoms" section is inconsistent with his actual reason for the doctor's visit. On April 27, 2010, Plaintiff's review of systems does say, "Denies joint pain, swelling, stiffness, cramping, weakness, myalgias," and,

"Denies weakness, syncope, dizziness, seizures, de-pression, anxiety, memory changes" (Tr. 383), but the visit is specifically for chronic neck and back pain and Plaintiff's complaints of getting "dizzy on bending/stand too fast." (Tr. 382). On July 22, 2010, Plaintiff's review of systems does say, "Denies joint pain, swelling, stiffness, cramping, weakness, myalgias," and, "Denies headache, poor vision, diplopia, poor hearing, tinnitus, epistaxis, sore throat, hoarseness" (Tr. 366-67), but the visit was specifically for Plaintiff's complaints of numbness and weakness in his arms causing him to drop things and headaches. (Tr. 366). On December 13, 2010, Plaintiff's review of systems does say, "Denies joint pain, swelling, stiffness, cramping, weakness, myalgias" (Tr. 353), but the visit was specifically for "clenching pain" that Plaintiff described as "constant, intensity fluctuates" and chronic neck and back pain were part of Plaintiff's assessment. (Tr. 354, 356, 357).

Nevertheless, any contradiction between portions of the review of symptoms section and Plaintiff's actual complaints and the doctor's assessment is of no moment because the ALJ did not rely exclusively on the findings in the review of symptoms section but thoroughly considered Plaintiff's subjective complaints, physical examination findings, and physicians' assessments and treatment recommendations from all of his appointments, including those referenced above. (Tr. 42-49). With respect to the April 2010 appointment, the ALJ discussed Plaintiff's complaints to the doctor but also noted that he "requested Tramadol 100mg HS on an as needed basis, and he explained that this medication helped with the pains." (Tr. 47). As to the July 2010 appointment, the ALJ again discussed Plaintiff's subjective complaints and noted that

> for the first time since the last orthopedic exam in Jul 2006, the physical exam contains abnormal findings regarding numbness. At this time, the claimant had 3-4/5 sensation in the upper extremities, more so on the outside of both arms. The assessment was questionable nueropathy. The provider recommended and EMG/NCV to assess the numbness in the fingers and the claimant's report of

-17-

dropping things. However, there are no abnormal findings regarding decreased grip strength, loss of range of motion, or atrophy, for example.

(Tr. 48). Finally, with respect to the December 2010 visit, again, the ALJ addressed Plaintiff's subjective complaints of chronic neck and back pain but also noted that his present pain regimen was helping, his current pain level was at a "5" and he was able to tolerate his medications without side effects. (Tr. 48-49). The ALJ's discussion is similarly detailed with respect to all of Plaintiff's medical records. He does not mention the findings in the review of symptoms without also discussing the Plaintiff's complaints and the physician's assessments. While the court recognizes the discussion of this and other courts questioning the probative value of review of symptoms-like findings, see, e.g., Santana v. Astrue, No. 12 CIV. 0815, 2013 WL 1232461 at *12-13 (E.D.N.Y. March 26, 2013), Rutland v. Astrue, No. 2:09-3263-RSC, 2010 WL 4226011 at *5 (D.S.C. Oct. 19, 2010), the ALJ here did not consider Plaintiff's review of symptoms in a vacuum or ignore other portions of the medical records. Therefore, Plaintiff's argument to this end is unavailing and remand is not appropriate.

### 4.     Treating Physicians' Opinions

Plaintiff argues that the ALJ ignored the work-preclusive limitations provided by his treating providers, Dr. Jachna and Mr. Rosenberger. The Social Security Administration's regulations provide that "[r]egardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. § 404.1527(c). Generally, more weight is given to the opinions of examining physicians than nonexamining physicians. More weight is given to the opinions of treating physicians since they are more likely to be able to provide a detailed, longitudinal picture of a claimant's medical impairment. See 20 C.F.R. §§ 404.1508 and § 404.1527(c)(2). The medical opinion of a treating physician is

-18-

entitled to controlling weight, i.e. it must be adopted by the ALJ, if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. See 20 C.F.R. § 404.1527(c)(2), SSR 96-2p, and Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence, it should be accorded significantly less weight." Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). Under such circumstances, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." Mastro, 270 F.3d at 178 (citing Hunter v. Sullivan, 993 F.2 31, 35 (4th Cir. 1992)).

In determining what weight to give the opinions of medical sources, the ALJ must apply all of the factors in 20 C.F.R. § 404.1527(c)(1)-(6), which are: whether the source examined the claimant; whether the source has a treatment relationship with the claimant and, if so, the length of the relationship and the frequency of examination; the nature and extent of the treatment relationship; the supportability and consistency of the source's opinion with respect to all of the evidence of record; whether the source is a specialist; and, other relevant factors. See SSR 96-2p; Hines v. Barnhart, 453 F.3d 559, 563 (4th Cir. 2006).

On November 21, 2012, Dr. Jachna completed a Mental Residual Functional Capacity Questionnaire regarding Plaintiff. Dr. Jachna did not complete any portion of the form requesting an assessment of Plaintiff's functional limitations. Rather, he referred to attached treatment notes for most questions. Dr. Jachna indicated that Plaintiff's depression worsened his pain. Dr. Jachna estimated that if Plaintiff attempted to work he would miss more than 4 days of work per month. He indicated that Plaintiff's impairments lasted or were expected to last at least 12 months. Dr. Jachna stated that Plaintiff was not a malingerer. Dr. Jachna opined that Plaintiff's limitations did apply

prior to his date last insured. (Tr. 747-56).

  The ALJ gave little weight to Dr. Jachna's opinion:

> Dr. Jachna from the VA clinic provided a medical source statement indicating that the severity of the mental conditions generally prevent the claimant from working on a sustained basis, e.g., more than four absences from work per month (17F). Dr. Jachna has a treating relationship with the claimant, but I give little weight to any inference in Dr. Jachna's opinion suggesting that the mental impairments prevent the claimant from performing work consistent with the residual functional capacity, at least from July 2005 through the end of 2010. For example, Dr. Jachna provided little explanation as to how arrived at his conclusions regarding the claimant's level of mental functioning other than "see attached" or "see notes." If the "notes" Dr. Jachna refers to include those from the VA, then I note that the VA records, including those from the primary care and mental health providers, do not support his statements, at least from July 2005 through the end of 20 10, because during this time, the claimant routinely indicates that Effexor is effective and the findings on the mental status exams are largely normal.

(Tr. 57).

  As discussed in more detail above, and as recognized by the ALJ, Dr. Jachna's treatment notes reveal that Plaintiff had "continued excellent response of mood and irritability to Effexor, with no side effects," and Dr. Jachna repeatedly concluded Plaintiff was "doing well" (Tr. 57, 360, 390, 393, 399, 607). Plaintiff's other mental health providers reached the same conclusions throughout his treatment. (Tr. 49-52, 57, 487, 494, 475-76, 507, 534, 538, 626-27). Plaintiff himself reported that his treatment regimen was effective and that he was "doing real[ly] well" and engaging in activities such as fishing and exercising regularly. (Tr. 475-76). Plaintiff told his treating source that he was "happier" when "staying busy" and requested a letter stating that working helped his anxiety (Tr. 476, 487). In the absence of any explanation from Dr. Jachna regarding his conclusion that Plaintiff could not work as well as his own treatment notes, the notes of other providers indicating that Plaintiff was doing well with therapy and medication, and the opinions of the state agency

consultants who both found that Plaintiff had no degree of limitation due to mental conditions[3] (Tr. 431-433, 437), substantial evidence supports the ALJ's decision to afford Dr. Jachna's opinion little weight. Furthermore, as stated above, other than his opinion regarding the number of days of work Plaintiff would miss per month, Dr. Jachna did not offer an opinion as to Plaintiff's specific work-related limitations, but instead, offered a conclusory statement on an issue reserved to the Commissioner, that is, whether Plaintiff was disabled, which is not entitled to any special significance. 20 C.F.R. § 404.1527(d)(1); SSR 96-5p; Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996).

Although Mr. Rosenberger provided a more detailed opinion regarding Plaintiff's limitations, substantial evidence support's the ALJ's decision to afford it little weight. On November 13, 2012, Mr. Rosenberger completed a Mental Residual Functional Capacity Questionnaire regarding Plaintiff. Mr. Rosenberger indicated that Plaintiff's diagnoses were major depression, recurrent; diabetes back pain, osteoarthritis; occupational maladjustment; and a current GAF score of 59. He indicated that Plaintiff was treated with medication and individual therapy/social work counseling. He indicated that Plaintiff was "seriously limited but not precluded" in his abilities to make simple work-related decisions and to be aware of normal hazards and take appropriate precautions. Mr. Rosenberger found Plaintiff to be "unable to meet competitive standards" or to have "no useful ability to function" in all other mental abilities and aptitudes needed to perform unskilled, semi-skilled, or skilled work. Mr. Rosenberger explained that Plaintiff had "a lot of problems with

---

[3]The ALJ also gave little weight to these opinions that Plaintiff had no restrictions, and did account for some mental limitations in the RFC "in an effort to account for the combined effect of the physical and mental conditions." (Tr. 57).

anxiety and depression and is very quick to anger or frustrate" and that Plaintiff needed "a lot of time and individual attention to get through problems." Mr. Rosenberger indicated that Plaintiff had a low IQ or reduced intellectual functioning due to his memory deficits. Mr. Rosenberger estimated that if Plaintiff attempted to work he would miss more than 4 days of work per month. He indicated that Plaintiff's impairments lasted or were expected to last at least 12 months. Mr. Rosenberger stated that Plaintiff was not a malingerer and that his symptoms were reasonably consistent with the functional limitations described. Mr. Rosenberger also explained that Plaintiff "does not deal with other people well – easily irritated. Memory and cognitive symptoms cause a lot of frustration. Depression makes it hard to go places." Mr. Rosenberger opined that Plaintiff's limitations did apply prior to his date last insured. (Tr. 738-742).

After discussing Dr. Jachna's opinion, the ALJ addressed Mr. Rosenberger:

> In the same way, I give little weight to the opinions of Mr. Rosenberger, who also indicated that mental impairments prevent the claimant from performing the basic mental demands of work on a consistent basis (14F). However, unlike Dr. Jachna, Mr. Rosenberg is a licensed clinical social worker rather than a physician, and as a social worker, Mr. Rosenberg is not an acceptable medical source within the meaning of the Regulations. Furthermore, Mr. Rosenberg completed his statement almost two years after the date last insured. He indicated that the claimant does not deal well with other people, he is easily irritated, and he has memory loss, depression, and decreased cognition, for example. The VA records, including those from the primary care and mental health providers, do not support these statements from July 2005 through the end of 2010, because during this time, the claimant routinely indicates that Effexor is effective and the findings on the mental status exams are largely normal. Furthermore, Mr. Rosenberg confirms that he based part of his opinions on memory testing from May 2011 and neuropsychological testing from October 2012, but both of these tests occurred subsequent to the date last insured. The record as a whole does not indicate that the findings represent the claimant's level of functioning prior to the date last insured.

(Tr. 57-58).

As an initial matter, the ALJ recognized that Mr. Rosenberger, a social worker, was not an

-22-

acceptable medical source.  Therefore, his opinion could not receive controlling weight. <u>See</u> 20 C.F.R. §§ 404.1513, 404.1527; SSR 06-03p (only opinions from acceptable medical sources can be afforded controlling weight). Additionally, not only was Mr. Rosenberger's opinion offered more than two years after Plaintiff's date last insured, he did not provide services to or evaluate Plaintiff during the relevant time period. (Tr. 57).  Finally, Mr. Rosenberger's opinion is inconsistent with the treatment notes from Plaintiff's mental health providers, as discussed in detail above.  Therefore, substantial evidence supports the ALJ's decision to accord little weight to Mr. Rosenberger's opinion.

### III.  CONCLUSION

This Court is charged with reviewing the case only to determine whether the findings of the Commissioner were based on substantial evidence. <u>Richardson</u>, 402 U.S. at 390. As previously discussed, despite the Plaintiff's claims, she has failed to show that the Commissioner's decision was not based on substantial evidence. Based upon the foregoing, this Court finds that the ALJ's findings are supported by substantial evidence. Therefore, it is RECOMMENDED that the Commissioner's decision be AFFIRMED.

 s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

July 26, 2016
Florence, South Carolina